**IN THE UNITED STATES DISTRICT COURT**
**EASTER DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

**VIRENDAR K. VERMA, M.D., and**
**REHAB AND PAIN MANAGEMENT CLINIC, P.A.**                    **PLAINTIFFS**

**v.**                              **5:06CV00043-WRW**

**JEFFERSON HOSPITAL ASSOCIATION**
**d/b/a JEFFERSON REGIONAL MEDICAL**
**CENTER and REHABCARE GROUP, INC.**                    **DEFENDANTS**

<u>**ORDER**</u>

Pending is Defendant Jefferson Hospital Association's ("JRMC") Motion for Summary

Judgment on Plaintiffs' Antitrust Allegations (Doc. No. 290), which is adopted by Defendant

Rehab Group ("RehabCare") (Doc. No. 293).

Plaintiffs' Amended Complaint alleges violations of the Sherman Anti-Trust Act (the

"Act").[1] Plaintiffs allege that Defendants violated the Act through an exclusive dealings contract

under which RehabCare is the only entity allowed to provide rehabilitation services to JRMC

patients.[2] Plaintiffs also allege that Defendants conspired to monopolize the rehabilitative

---

[1]Doc. No. 116. 15 U.S.C. §1 reads:
>Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $ 100,000,000 if a corporation or, if any other person, $ 1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

[2]Doc. No. 116. 15 U.S.C. §2 reads:
>Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with

1

treatment of patients in the geographic region, and that Defendants' actions constitute a boycott and a refusal to deal under by the Sherman Anti-Trust Act.[3] Defendants maintain that Plaintiffs lack standing to assert an anti-trust claim, that Defendants' exclusive contract is legal and does not exclude Plaintiffs, and that Plaintiffs can't satisfy the elements of a boycott or monopolization claim.[4]

For reasons set out in detail below, Defendants' Motions for Summary Judgment on Plaintiffs' Anti Trust Allegations (Doc. Nos. 290, 293) are GRANTED. Defendants' pending Motions to Exclude Report and Testimony of Dr. Charles Venus are GRANTED in connection with anti-trust issues (Doc. Nos. 282, 283), but DENIED in connection with other damages.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds.[5] The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[6]

---

foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $ 100,000,000 if a corporation, or, if any other person, $ 1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

[3] Doc. No. 116.

[4] Doc. No. 300.

[5] *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56.

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an extreme remedy that should only be granted when the movant has established a right to the judgment beyond controversy.[7]  Nevertheless, summary judgment promotes judicial economy by preventing trial when no genuine issue of fact remains.[8]  I must view the facts in the light most favorable to the party opposing the motion.[9]  The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*,"[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.[10]

Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.[11]

---

[7]*Inland Oil & Transport Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979).

[8]*Id.* at 728.

[9]*Id.* at 727-28.

[10]*Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)).

[11]*Anderson*, 477 U.S. at 248.

Summary judgment "should be used sparingly" in complex anti trust litigation.[12]

Summary judgment is, however, "appropriate in antitrust cases, just as in any other litigation,

upon a showing of an absence of any genuine issue of material fact."[13]

## II. BACKGROUND

Plaintiff Dr. Verma is a medical doctor with Board Certification in Rehabilitation

Medicine; he is the only doctor with this Board Certification associated with either RehabCare in

Jefferson County, or with JRMC.[14] On August 25, 2005, Dr. Verma was reappointed to Active

Medical Staff of JRMC for a period of 2 years.[15] Dr. Verma first contracted with Defendant

RehabCare on June 29, 1992, and RehabCare entered into a second contract with Dr. Verma's

company, Rehab and Pain Management Clinic, Inc. ("RPMC"), on January 1, 1997.[16]

---

[12]*Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473 (1962).

[13]*Willmar Poultry Co. v. Morton-Norwich Prods, Inc*., 520 F.2d 289, 293 (8th Cir. 1975).

[14]Doc. No. 116.

[15]*Id.*

[16]*Id.* Dr. Verma's 1992 Letter of Agreement with RehabCare is in connection with the position of Associate Medical Director of the RehabCare Program at JRMC. Under the agreement, Dr. Verma was obligated to assist the Medical Director to "[p]rovide the clinical supervision and medico-administrative duties required to assure a successful operation of a quality rehabilitation unit; [d]evelop and document the medical protocols which are to be used for the varying types of disabilities admitted to the RehabCare Unit; [p]rovide medical direction and/or consultations with attendin physicians, when necessary, to assure safe and generally accepted standards of care for rehabilitation patients; and [p]rovide medical leadership for the RehabCare Program by providing contact with the RehabCare team and participating in the patient staffing and administrative meetings," among others. Under the agreement, Dr. Verma was an independent contractor, and neither RehabCare nor JRMC could "have or exercise any control or direction over the clinical methods by which [he] shall carry out the responsibilities of this position . . . ." Doc. No. 116, Ex. 1. The 1997 agreement between RehabCare and Rehab & Pain Management Clinic binds Rehab & Pain Management Clinic to "supply licensed physicians to provide associate medical director services to the RehabCare Program." Doc. No. 116, Ex. 2.

Around August 30, 1999, JRMC and RehabCare hired Dr. Sue Frigon, a white female, as the medical director of the rehabilitation unit.[17] Plaintiffs allege that Dr. Frigon should not have been hired in that position because she is not board certified, and the position was advertised for board certified physicians only.[18] RehabCare allegedly encouraged JRMC patients to request Dr. Frigon as their rehabilitation doctor instead of Dr. Verma, and allegedly encouraged JRMC staff to refer patients to Dr. Frigon instead of Dr. Verma.[19] When Dr. Verma did get a referral, RehabCare allegedly contacted the referring doctors and tried to get the referral changed to Dr. Frigon.[20]

Dr. Verma complained to JRMC's chief of staff about this practice, and about a non-board certified neurologist serving as the medical director and practicing rehabilitation medicine.[21] Dr. Verma alleges that Dr. Frigon has, as an agent of RehabCare, crossed Dr. Verma's name off of records and replaced it with her own, interfered with Dr. Verma's medical orders, and visited Dr. Verma's patients while making rounds.[22]

---

[17]*Id.* Plaintiffs' Amended Complaint also alleges racial discrimination, breach of contract, retaliation, tortious interference with business expectancy, and violation of the Arkansas Civil Rights Act. Doc. No. 116. However, because this Order is specific to Plaintiffs' anti-trust claims, I will not focus on details in Plaintiffs' Amended Complaint unless those details are pertinent to Defendants' Motion for Summary Judgment on Plaintiffs' Anti-Trust Allegations.

[18]*Id.*

[19]Doc. No. 116.

[20]*Id.*

[21]*Id.*

[22]*Id.*

On January 16, 2006, Dr. Verma received notice that his contract with RehabCare was terminated effective February 18, 2006.[23] Plaintiffs allege that in February, 2006, JRMC staff members told referring doctors that Dr. Verma was not admitting or consulting patients on the rehabilitation unit; a referring doctor was told that there was no choice other than write a rehabilitation consult to Dr. Frigon if the doctor wanted his patient to receive care at JRMC.[24] After February 18, 2006, Dr. Verma was allegedly no longer allowed to admit patients to the JRMC rehabilitation floor, and Dr. Verma's patients were either discharged from the rehabilitation floor or forced to switch to Dr. Frigon.[25]

Plaintiffs allege that JRMC has an exclusive contract with RehabCare for RehabCare to provide all rehabilitation services for patients at JRMC, that JRMC and RehabCare are the exclusive rehabilitative medical providers for Jefferson County and surrounding areas, that JRMC conducts business affecting interstate commerce, and that JRMC and RehabCare exercise market control of the south Arkansas and Western Mississippi regions.[26] Dr. Verma alleges he was squeezed out of Defendants' facilities completely.[27]

RehabCare and JRMC are currently parties to an Amended and Restated Acute Rehabilitation Agreement (the "Agreement").[28]  Under the Agreement, RehabCare is obligated to provide or arrange staffing for the acute inpatient rehabilitation program (the "Program"),

---

[23]*Id.*

[24]*Id.*

[25]Doc. No. 116.

[26]*Id.*

[27]*Id.*

[28]Doc. No. 290, Ex. 3.

including a Program Director, Medical Director, Admissions Coordinator, and Therapy

Personnel.[29] RehabCare is also required to: provide orientation regarding the Program for the

directors of JRMC's departments and training for JRMC's nursing staff assigned to the Program;

propose for the Hospital's consideration policies and procedures for the Program; assist in

JRMC's preparation of materials relating to the Program; upon request provide space planning

advice to JRMC; and provide specialized therapy equipment, along with other obligations.[30]

JRMC must, according to the Agreement: provide and maintain the space, equipment,

materials and supplies required to operate the Program; discuss with RehabCare's local Program

Director the Program and strategies for improving service; provide linen, laundry, dietary,

medical records, pastoral care, and other services; and provide the Program with nursing

personnel.[31]

## III. DISCUSSION

### A. <u>Private Actions Under The Sherman Anti-Trust Act</u>

The first step in analyzing an alleged violation of the Sherman Anti-Trust Act in a private

action is to determine if the plaintiff has standing. "[A]ny person who shall be injured in his

business or property by reason of anything forbidden in the antitrust laws may sue therefor in

any district court of the United States . . . ."[32] While the scope of the private standing statute

---

[29]*Id*. Therapy Personnel included: Physical Therapist(s), Physical Therapist Assistant(s), Occupational Therapist(s), Certified Occupational Therapy Assistant(s), Rehabilitation Aide(s), Speech Pathologist(s), Social Worker(s), and Recreational Therapy.

[30]*Id*.

[31]*Id*.

[32]15 U.S.C. § 15

appears broad, the Supreme Court defined standing factors that narrow the class of individuals

entitled to recover under that section.[33]  The factors include:

> (1) the causal connection between the alleged antitrust violation and
> the harm to the plaintiff; (2) improper motive; (3) whether the injury
> was of a type that Congress sought to redress with the antitrust laws;
> (4) the directness between the injury and the market restraint; (5) the
> speculative nature of the damages; [and] (6) the risk of duplicate
> recoveries or complex damage apportionment.[34]

The third factor is dispositive: a plaintiff who has not suffered an "antitrust injury" does not have

standing.[35] An antitrust injury is an "injury of the type the antitrust laws were intended to prevent

and that flows from that which makes the defendants' acts unlawful."[36] The Sherman Anti-Trust

Act was intended to protect competition, not competitors.[37]

If a plaintiff has standing, the next step is to find if the arrangement allegedly violating

the Act is unreasonable *per se*, or if the arrangement should be analyzed under the rule of

reason.[38] An arrangement is unreasonable *per se* if the arrangement's "nature and necessary

effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish

---

[33]*McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983) (relying on *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 535-45 (1983)).

[34]*McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983).

[35]See *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977).

[36]*Cargill, Inc. v. Monfort, Inc*., 479 U.S. 104, 109 (1986).

[37]See *Leegin Creative Leather Prods. v. PSKS, Inc.,* 127 S. Ct. 2705, 2724 (2007) (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990)).

[38]See *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs.,* 996 F.2d 537 (2nd Cir. 1993).

their illegality."[39]  Arrangements that are not unreasonable *per se* are analyzed under the rule of reason, "which requires a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition."[40]

In analyzing a violation under the rule of reason, "one must focus on the detrimental effects to competition, often by defining the relevant market and considering evidence of the defendant's power within that market."[41] "Proof of actual detrimental effects, such as reduction of output," can negate the necessity of defining market power; market power is a "surrogate for detrimental effects."[42]    If a plaintiff proves either actual detrimental effects or market power, then the burden of proof shifts to the defendant to show pro-competitive effects.[43] If the defendant is successful in showing pro-competitive effects, the burden shifts back to the plaintiff to demonstrate that the defendant's legitimate goals can be reached in a "substantially less restrictive manner."[44] Then the court weighs "the harms and benefits to determine if the behavior is reasonable on balance."[45]

---

[39]*National Soc'y. of Prof. Eng'rs v. United States,* 435 U.S. 679, 692 (1978). Certain types of arrangements are generally considered unreasonable *per se*: price-fixing arrangements between competitors (*Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343-348 (1982)), and certain tying agreements (*International Salt Co. v. United States*, 332 U.S. 392 (1947)), among others.

[40]See *Continental T.V.*, *Inc.* v. *GTE Sylvania Inc., 433 U.S. 36* (1977).

[41]*Flegel v. Christian Hosp. Northeast-Northwest*, 4 F.3d 682, 688 (8th Cir. 1993).

[42]*Id*.

[43]*Id*.

[44]*Bhan v. NME Hospital*, 929 F.2d 1404, 1413 (9th Cir. 1991).

[45]*Id*.

**B. <u>Standing</u>**

To have standing in a private action under the Act, an individual must have suffered an anti-trust injury -- an injury of the type that the anti-trust laws were enacted to protect.[46] The purpose of the anti-trust laws is to protect competition.[47]  Courts look to factors such as decreased output, increased prices, or reductions in the level of quality in a particular market in analyzing whether competition was harmed.[48] If there is no direct evidence of a detrimental effect to competition, a court can consider a defendant's market power.[49]

Plaintiffs allege a decrease in the quality of patient care because patients were: (1) treated by a non-board licensed rehabilitation doctor; (2) not referred to a board certified physiatrist; and (3) not instructed of the choice to be treated by a physiatrist.[50] Plaintiffs offer deposition testimony that each of those three occurred.[51]  But, Plaintiffs do not show how any of these reduced the quality in the market, or otherwise harmed competition.[52] I found no evidence in the record, beyond Plaintiffs' allegations, that treatment by a non-board certified physiatrist lowered

---

[46]See *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977).

[47]See *Leegin Creative Leather Prods. v. PSKS, Inc.,* 127 S. Ct. 2705, 2724 (2007).

[48] See *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.,* 203 F.3d 1028 (8th Cir. 2000), *Miller v. Indiana Hosp*., 814 F. Supp. 1254, 1265 (W.D. Pa. 1992).

[49]See *Flegel*, 4 F.3d at 688.

[50]Doc. No. 206.

[51]Doc. No. 206, Exs. 1, 2, 3, 4.

[52]See *Balaklaw v. Lovell*, 14 F.3d 793, 798 (2nd Cir. 1994) ("The evidence indicates that some surgeons and patients preferred respondent's services, . . . but there is no evidence that any patient who was sophisticated enough to know the difference between two anesthesiologists was not able to go to a hospital that would provide him with the anesthesiologist of his choice.") (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30 (1984)).

the level of quality in patient care.[53]  Allegations alone are not enough to withstand a motion

summary judgment. Plaintiffs' other alleged anti-trust injuries were injuries to Dr. Verma as a

physician, but not anti-trust injuries.[54]

Because there is no direct evidence that competition was harmed, I could consider

Defendants' market power. But, as explained below, Plaintiff and Defendants do not share a

market; market power is irrelevant here.

Because Dr. Verma did not suffer an anti-trust injury, he does not have standing to bring

anti-trust claims. Further, even if Dr. Verma did have standing, his anti-trust claims would fail.

C. **Plaintiff's Claim that the Agreement Violates the Act**

Exclusive contracts are generally analyzed under the rule of reason.[55]  In analyzing a

violation under the rule of reason, "one must focus on the detrimental effects to *competition*,

---

[53]See *Miller v. Indiana Hosp.*, 814 F. Supp. 1254, 1265 (W.D. Pa. 1992)("In order to show a substantial effect on competition, it is necessary to show that there was either (1) a rise in the price of medical services above a competitive level; (2) a decrease in the supply of doctors in the relevant market, or (3) a decrease in the quality of medical services provided.") (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984)).

[54]Doc. No. 206. Dr. Verma alleged as other anti-trust injuries that he was prevented from seeing his patients on the rehab floor, that doctors could not have Dr. Verma follow their patients, and that doctors were told that Dr. Verma could not treat their patients. There are numerous cases brought by health care professionals alleging that defendant(s) violated the anti-trust laws by prohibiting plaintiff's practice of their professions; the courts have to a large extent found no violation of  anti-trust laws. See *Minnesota Ass'n. of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655 (8th Cir. 2000); *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs.,* 996 F.2d 537 (2nd Cir. 1993); *Flegel v. Christian Hosp. Northeast-Northwest*, 4 F.3d 682 (8th Cir. 1993); *Barry v. Blue Cross of* California, 805 F.2d 866 (9th Cir. 1986); *Diaz v. Farley,* 215 F.3d 1175 (10th Cir. 2000); *BCB Anesthesia Care, Ltd. v. Passavant Mem'l. Hosp. Ass'n*., 36 F.3d 664, 668 (7th Cir. 1994)*Taylor v. Christus St. Joseph Health Sys*., No. 5:04-CV-153-DF, 2006 U.S. Dist. Lexis 40031 (March 28, 2006 E.D. Tx); *Wagner v. Magellan Health Services, Inc*., 121 F. Supp 2d 673 (N.D. Ill. 2000).

[55]See *Minnesota Ass'n. of Nurse Anesthetists v. Unity Hosp*., 208 F.3d 655 (8th Cir. 2000).

often by defining the relevant market and considering evidence of the defendant's power within that market."[56] "Anti-trust claims often rise or fall on the definition of the relevant market."[57]

Plaintiffs allege that the Agreement between JRMC and RehabCare impedes competition by preventing Dr. Verma from practicing his specialty. To find that the Agreement impedes competition, I must first find that Plaintiffs and Defendants are competitors. To find that Plaintiffs and Defendants are competitors, I must decide whether the parties must operate in the same product market.

The parties do not share a product market. Plaintiffs' expert witness, Dr. Venus, defined the product market as "rehab care planning."[58] Defendants agree.[59] Dr. Venus then described rehab care planning as "*a physician* who does the *planning of rehab care* plan for patients. He doesn't provide the therapy, he is not a hands-on therapist, we are not talking about that, we are talking about the *planning of the rehabilitation itself*."[60] I conclude, based on the Agreement and other facts in the record, that RehabCare does not share that product market. RehabCare is in the market of providing staff, management, and other administrative support to the Program at JRMC. The physicians provided by RehabCare to the Program may provide planning of rehabilitation care; RehabCare does not. Likewise, based on the facts in the record, JRMC is not in the market of planning the rehabilitation care of patients.

---

[56]*Flegel*, 4 F.3d at 688 (emphasis added).

[57]*Bathke v. Casey's Gen. Stores, Inc*. 64 F.3d 340, 345 (8th Cir. 1995).

[58]Doc. No. 290, Ex. 1, pg. 38 at lines 10-25 and pg. 39 at lines 1-14.

[59]Doc. No. 300. "For purposes of its motion, JRMC assumes that Venus properly defined the product market." *Id.*

[60]Doc. No. 290, Ex. 1, pg. 39 at lines 1-14. (emphasis added).

Because the parties do not share a product market, the parties are not competitors.[61] JRMC is a hospital offering generally the types of services and facilities that one can expect to find in a hospital, including a Rehabilitation Program. RehabCare staffs that Program and provides other administrative support. For JRMC and RehabCare to be competitors, JRMC would have to be in the business of providing those services RehabCare is bound by the Agreement to provide, or, RehabCare would have to be a hospital. Dr. Verma, a physician, may compete with other physicians at JRMC or RehabCare, but does not compete with either of the Defendants.

As Plaintiffs and Defendants do not operate in the same product market and are not competitors, I cannot find that the Agreement has a detrimental affect on competition. Because the Agreement has no detrimental effect on competition, summary judgment on the exclusive contract claim is appropriate.

### D. Plaintiffs' Boycott and Refusal to Deal Claim

Boycott agreements "cripple" market freedom[62] and belong to the category of arrangements to which the *per se* rule applies.[63] A boycott, or refusal to deal, is a horizontal "concerted refusal" by traders to do business with another trader(s).[64] The facts in

---

[61]In connection with horizontal relationship, Plaintiffs' expert antitrust witness, Dr. Venus, testified that RehabCare and JRMC have a vertical relationship. Dr. Venus did state that but-for the Agreement, JRMC and RehabCare would have a horizontal aspect to their relationship. Doc. No. 206, Ex. 15.  That situation, however, is a hypothetical situation and I will not take that hypothetical situation into account in my analysis. Defendants also maintain that RehabCare and JRMC are not horizontal competitors. *See* Doc. No. 300.

[62]See *United States v. Patten*, 226 U.S. 525, 542.

[63]See *Klor's v. Broadway-Hale Stores*, 359 U.S. 207, 209 (1959).

[64]*Id.* at 212.

*Klor's v. Broadway-Hale Stores* provide a simple example of a horizontal agreement.[65] George Klors operated an appliance store that was as capable as Broadway-Hale, a competing appliance store, to deal in all brands of appliances.[66] Manufacturers and distributors of major-brand appliances agreed among themselves, after being threatened by Broadway-Hale, not to sell to Klors, or to sell to Klors only at higher prices and under unfavorable terms.[67] The manufacturers' and distributors' concerted actions thwarted Klors's ability to compete, and caused loss of profits, goodwill, reputation, and prestige.[68]

Thus, to have a boycott, there must be an agreement between parties at the same market level who refuse to deal with another party; a single party's refusal to deal with another party does not constitute a boycott. As discussed above, JRMC and RehabCare do not share a market. Because there was no concerted refusal by parties at the same market level, Plaintiffs' boycott claim fails.

### E. Plaintiffs' Monopoly Claim

The elements of a claim under 15 U.S.C. § 2 are: "(1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anti-competitive conduct directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success."[69]

---

[65]*Id.* at 209.

[66]*Id.*

[67]*Id.*

[68]*Id.*

[69]*Trace X Chemical, Inc. v. Canadian Industries, Ltd.*, 738 F.2d 261, 265 (8th Cir. 1984). See also *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 549 (8th Cir. 2007) (to show an attempted monopolization claim . . . a plaintiff must prove "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success") (citing *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 801 (8th Cir. 1987)).

To succeed in a monopolization claim, a plaintiff must show that a defendant "(1) possessed monopoly power in the relevant market, and (2) used its monopoly power to foreclose competition, gain a competitive advantage, or destroy a competitor."[70]

It is critical to a monopoly claim to define the relevant market. Again, Plaintiffs and Defendants do not operate in the same market. Thus, Plaintiffs' monopoly claim fails. Further, assuming that Defendants possessed monopoly power, there is no evidence in the record that would support a conclusion that Defendants used that power in a predatory or anti-competitive action directed at an unlawful purpose.

## CONCLUSION

While Defendants may have committed numerous other wrongs, as alleged by Plaintiffs, I conclude that the types of wrongs committed, if any, are not the types that the Sherman Anti-Trust Act seeks to protect against and that Plaintiffs have suffered no anti-trust injury. Since Plaintiffs have suffered no anti-trust injury, Plaintiffs do not have standing under the Act. Because Plaintiffs do not have standing, Defendants' Motion for Summary Judgment on Plaintiffs' Anti Trust Allegations is GRANTED.

IT IS SO ORDERED this 17th day of December, 2007.


/s/Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

---

[70]*Trace X Chemical, Inc. v. Canadian Industries, Ltd.*, 738 F.2d 261, 265 (8th Cir. 1984). (citing *United States v. Griffith, Inc.* 334 U.S. 100, 107 (1948); *Pashcall v. Kansas City Star Co.*, 727 F.2d 692 (8th Cir. 1984); (other citations omitted).